FIRST NATIONAL BANK OF SPARTA v. HUNTER et al.—125
S. W. (2d), 183.

Middle Section.    Sept. 24, 1938.

Petition for Certiorari Denied by Supreme Court, March 4, 1939.

Haile & Cox, of Cookville, for appellants.
S. G. Butler, C. P. Hutcheson, and Camp & Camp, all of Sparta, for appellees.

FELTS, J.   This is a suit by the First National Bank of Sparta to recover $13,600, with interest, for money loaned by it to Quarles & Hunter, a partnership composed of J. L. Quarles and H. B. Hunter.

For several years this firm carried on a general mercantile and an undertaking business in Sparta, and in the course of this business borrowed the money now sought to be recovered.

On July 17, 1934, J. L. Quarles died, leaving, besides his interest in the partnership, a farm of about 366 acres, the store house occupied by the partnership, a residence, some town lots, and some per-

sonalty perhaps not of great value. He left a will, by which he named H. B. Hunter, his partner and brother-in-law, as his executor without bond. He devised the farm and the store house to Hunter, and his residence to Mrs. Mary Cantrell, whom he called in his will "my beloved niece," but who was in fact a niece of his deceased wife, and who had been taken into his home when she was two years of age and had lived there ever since. He also devised to Mrs. Cantrell a one-half interest in another lot in Sparta, and the other half interest in this lot he devised to Mattie McCarroll; and the residue of his estate both real and personal he gave equally to H. B. Hunter and Mrs. Cantrell, share and share alike.

The bank filed the bill August 8, 1935. It alleged that the firm was indebted to the bank on seven notes, aggregating the principal sum of $13,600, copies of the notes being exhibited with the bill. Five of these notes were renewals, which had been executed by Hunter in the firm name after the death of Quarles. The other two had been made by the firm during the lifetime of Quarles, one being in the sum of $200, dated September 6, 1928, payable on demand, and the other being in the sum of $3,000, with a credit of $1,000 thereon, dated December 1, 1926, payable on demand.

The bill alleged that H. B. Hunter had qualified as executor of J. L. Quarles, deceased, and had taken charge of his estate, but that Hunter had filed no inventory, was not properly administering the estate, but was wrongfully appropriating it and the partnership assets to his own use; and that he was insolvent and the partnership and the estate of Quarles were also insolvent.

The bill was filed as a general creditors' bill. The legatees and devisees of the will of J. L. Quarles, and several persons claiming to be creditors of the partnership were joined as defendants. The bill sought to have the administration of the estate of Quarles transferred to the Chancery Court, sought to have Hunter enjoined from handling the assets of the estate and the partnership, and prayed for the appointment of a receiver to take charge of and administer the assets of the partnership and the estate of Quarles under the direction of the court, and for other appropriate relief.

On August 14, 1935, H. B. Hunter individually and as executor of J. L. Quarles, deceased, answered, admitting that the partnership was indebted to the bank on the notes exhibited with the bill, admitting also that the estate of Quarles was insolvent, but averring that the realty was more than sufficient to pay the debts, and denying that he had done anything improper in handling the estate of Quarles or the assets of the partnership, and that there was any necessity or occasion for the injunction or the receiver sought by the bill.

On August 17, 1935, upon a hearing, the Chancellor appointed a receiver, and sustained the bill as a general creditors' bill.

On February 13, 1936, Mrs. Mary Cantrell and husband, Robert Cantrell, filed an answer and cross-bill, in which they set up a claim against the estate of J. L. Quarles, deceased, for $15,400 for services rendered by them to him from 1923 to July 17, 1934, the date of his death, and alleged that this should be allowed as a preferred claim against the estate. They denied that the estate was liable for the bank's claim because, it was alleged, Quarles was not mentally capacitated, and because the loans were made in violation of the Federal and State Statutes in that Quarles was a director and vice-president of the bank and the loans were not approved in writing by all the directors, Quarles himself being mentally incapacitated to give such approval.

Hunter answered the cross bill, admitting that the loans were void for the reason stated, but denying the claim of the Cantrells; and the bank answered, denying that claim and also denying that there had been any illegality or irregularity in making the loans.

By an amendment to the cross bill Mr. and Mrs. Cantrell attacked the claim of the bank upon the further ground that the notes had been executed by Hunter after the death of Quarles and, consequently, were not binding obligations against his estate.

By an amendment to its original bill the bank was allowed to set up and seek recovery on the indebtedness it held against the firm of Quarles & Hunter at the time of the death of Quarles, which indebtedness was evidenced by notes as follows: a note for $3,200, dated April 7, 1934, due August 7, 1934; a note for $2,000, dated December 1, 1926, due on demand; a note for $200, dated September 6, 1928, due on demand; a note for $400, dated June 23, 1934, due December 23, 1934; a note for $4,000, dated June 29, 1934, due August 29, 1934; a note for $3,000, dated May 19, 1934, due August 19, 1934; a note for $800, dated May 1, 1934, due August 1, 1934. It was averred that the originals of all these notes except the $200 note and the $2,000 note had been turned over to Hunter upon his executing the renewals of these notes and had been lost or destroyed by him and could not be produced by the bank; and it sought and was allowed to file copies of said notes as exhibits to said amendment.

Mr. and Mrs. Cantrell moved to strike this amendment upon the ground that it was repugnant to the bill, because the bill showed that the bank had accepted the renewal notes executed by Hunter and had thereby satisfied and extinguished the notes on which the amendment sought to recover. They also demurred to the amendment because the original notes were not filed. Their demurrer was overruled, with leave to rely thereon on their answer. They filed an answer, in which they alleged the renewal notes had been accepted by the bank in payment and discharge of the notes for which the renewals were given; and that all the notes sued on in the amendment had been cancelled

630

and satisfied except the $2,000 note and the $200 note. Against these two notes they filed a plea of the Statute of Limitations of six years (Code, sec. 8600), upon which plea the bank joined issue.

The cause was heard orally according to the forms of chancery, pursuant to Ch. 119, Acts 1917, Code, sec. 10564; and on September 8, 1936, the Chancellor filed his written findings of fact and his conclusions of law thereon, and, in accordance therewith, a decree was entered, which allowed the bank a recovery upon all the notes it held of the firm of Quarles & Hunter at the time of Quarles' death, except the $200 note, which was held barred by the six year Statute of Limitations, and disallowed the claim of Mr. and Mrs. Cantrell. As to other matters action was reserved.

From this decree Mr. and Mrs. Cantrell appealed and have assigned errors. The bank has not assigned error upon the denial of its right to recover on the $200 note.

Mr. and Mrs. Cantrell, through twelve assignments of error, make four insistences, viz.: (1) Quarles' estate is not liable to the bank for the reason that all the loans were made in violation of the State and Federal Statutes, since the loans were not passed on and approved by the bank's board of directors; (2) Quarles' estate is not liable to the bank for the firm's indebtedness represented by the five notes which were held by the bank at the time of Quarles' death and which were later renewed in the firm name by Hunter, because the renewals were accepted by the bank in payment and discharge of the former notes, and the renewals by Hunter did not bind Quarles' estate; (3) the $2,000 note ($3,000 credited by $1,000) was barred by the six year Statute of Limitations; and (4) Mr. and Mrs. Cantrell are entitled to the amount claimed by them for services rendered, and are entitled to have this allowed as a preferred claim against the estate, because it is an individual and not a partnership debt and comes ahead of partnership debts in the settlement of the estate.

■ ■ (1) The defense of illegality of the loans was an affirmative defense, in the nature of a plea of confession and avoidance; and as to it the burden of proof was on the persons alleging such illegality, the appellants. 8 Am. Jur., Sec. 972, p. 574; 8 C. J., 994-996; Gibson's Suits in Chy. (3 Ed.), secs. 358, 443. They offered no proof tending to support this defense. The only testimony on the matter was that of the bank's cashier, Snodgrass, who testified that the board of directors regularly passed on and approved the loans and the renewals. There was no proof tending to show that Quarles was not mentally competent to transact business at the time the loans were made and at the time the renewals were made on which recovery was allowed. For some time before his death he was feeble and inactive;

but there is nothing to show that he was mentally incapacitated. So we think the Chancellor properly denied this defense.

█ (2) It is true the renewals by Hunter in the partnership name after the death of Quarles did not bind Quarles' estate. His death dissolved the partnership, terminated its existence, and necessarily ended Hunter's authority to act as agent for it in executing the renewal notes, even though they were given for a past indebtedness of the firm. Secs. 7870, 7874 of Code; Fowler v. Richardson, 35 Tenn., 508, 509, 3 Sneed 508, 509; Bank of Mobile v. Andrews, 34 Tenn., 535, 2 Sneed 535; Hatton v. Stewart, 70 Tenn., 233, 2 Lea 233.

██ But from this it does not necessarily follow that Quarles' estate did not remain still bound for the original indebtedness. The bank had loaned the firm the money, the firm had used it, it had enured to the benefit of both Quarles and Hunter, and it had not been re-paid. Without a note or notes, the law would raise an obligation upon both of them to repay the bank the money; and the bank had a right to treat the notes either as an absolute payment and discharge of the original indebtedness or only as a conditional payment or as mere evidence of the debt. As the learned Chancellor held, the bank was clearly entitled to amend so as to sue and recover on the firm's debt represented by the notes it held at the time of the death of Quarles, if this debt had not been paid and extinguished by the bank's acceptance of the renewal notes executed by Hunter after Quarles' death. First National Bank of Sparta v. James A. Yowell, 155 Tenn., 430, 440, 294 S. W., 1101, 52 A. L. R., 1411. But the bank was not entitled to do this, if the debt had been so paid and extinguished. Fowler v. Richardson, 35 Tenn., 508, 509, 3 Sneed 508, 509.

In the Fowler case Frierson and Fowler were partners and were indebted by an account to Toole in the sum of $10,409. After the firm was dissolved Frierson executed notes in the partnership name in settlement of the account and the notes were accepted by Toole "in full for account up to date." It was held that Fowler was not bound on the notes, because after the dissolution of the partnership Frierson had no power to bind Fowler by executing the notes; and that Fowler was not liable on the account, because the notes had been accepted in payment and satisfaction of the account, it being shown to have been the intention of both parties that the account should be extinguished by the notes.

In the Yowell case Yowell was indebted to the bank by a note. He executed a renewal note to the bank for the same amount, and the old note was marked "Paid" by the bank and surrendered. The bank's representative materially altered the renewal note by raising the interest rate, believing, from the representations of an endorser on this note, who arranged for the renewal, that such change had the approval of Yowell, the maker. The bank sued on the renewal note,

but was denied a recovery thereon because it had been materially altered without the maker's consent. Thereafter the bank sued on the original note, and was held entitled to recover thereon because it did not appear that the renewal note had been accepted in payment or discharge of the original note. In this case the court said:

■ "And with special reference to renewals of notes and bills, it is said in 8 C. J., 569, that: 'in so far as the taking of a renewal or new bill or note for an existing bill or note is concerned, it is generally held that the new bill or note is not a payment of the original instrument, in the absence of an understanding or agreement to that effect.' " [155 Tenn., 430, 294 S. W., 1103.]

To the same effect see: Madison Trust Co. v. Stahlman, 134 Tenn., 402, 183 S. W., 1012; Bank v. Buchanan, 87 Tenn., 32, 9 S. W., 202, 1 L. R. A., 199, 10 Am. St. Rep., 617; Dies v. Wilson County Bank, 129 Tenn., 89, 165 S. W., 248, Ann. Cas., 1915A, 1090; State Bank v. Mutual Tel. Co., 123 Minn., 314, 143 N. W., 912, Ann. Cas., 1915A, 1082, annotated; Davis v. Sloan Oil Co., 13 Tenn. App., 405, 416; Erwin Nat. Bank v. Riddle, 18 Tenn. App., 561, 576, 79 S. W. (2d), 1032.

The case of First National Bank of Sparta v. Yowell, supra, is annotated in 52 A. L. R., 1416. In this note it is said: "The authorities are agreed that whether a renewal note operates as a discharge of the note of which it is a renewal is dependent on the intention of the parties. It is a question of fact, not of law."

■ In arriving at the intention of the parties their words, conduct and all the circumstances must be considered. The surrender and cancellation of the old note is not conclusive, but is only one of the circumstances to be considered in inferring the intention of the parties. In 8 Am. Jur., 447, it is said:

". . . The fact that the original note is surrendered is not, however, conclusive on the question of discharge vel non; nor is it made conclusive by the added fact that the surrendered note is marked 'Paid.' It has been said that 'where, upon the execution of the new note, the old one is given up, this fact is entitled to great weight with the jury, but it does not raise a legal presumption of an agreement to extinguish it.' Elsewhere it has been said that if any reason not per se absurd can be suggested for delivering up the original note on the execution of a renewal note consistent with an intent that the renewal note shall not operate as a discharge, even though no evidence is offered in support thereof, the original note will be held not to be discharged. In still other cases the rule has been laid down that surrender of the original note upon execution and delivery of a renewal note does not extinguish the original one in the absence of an express agreement to that effect or unless such is the intention of the parties. In numerous other cases where it appeared that the

original note was surrendered upon renewal, it has been held that it is not discharged, but without any particular discussion of the effect of such surrender." (pp. 447, 448).

The Chancellor considered all the circumstances under which the renewals were made by Hunter, and found that it was not the intention of Hunter or the bank that such renewals should discharge the notes of the firm held by the bank at the time of Quarles' death. The bank had made the loans very largely upon the credit of Quarles. He had valuable property, and Hunter had very little. Hunter did not testify as a witness, and made no claim in his pleadings that the renewals were meant to be a discharge of the original notes. Snodgrass, the bank's cashier, testified that Hunter stated that the firm had plenty of assets to pay its debts, and its notes to the bank would be paid; and that the bank looked not only to the firm's assets but also to the individual assets of its members, and Quarles' property was what the bank mainly relied on both in making the loans and taking the renewals. It clearly appears that the bank had no intention of discharging Quarles by taking the renewals, and it was unaware of Hunter's lack of authority to bind Quarles' estate.

The bank could not very well keep past due paper, and it was a custom to request renewals and to surrender the old notes upon taking the renewals; and the Chancellor found that in taking the renewals from Hunter and in stamping the old notes "Paid" and turning them over to him, it was not the intention of either party to extinguish the firm's indebtedness; but that "the arrangement was just to carry the indebtedness along until it would be more convenient for the firm's business to be settled." In this finding of the Chancellor we concur.

(3) The Statute of Limitations begins to run against a note payable on demand from the date of the note and not from the date of the demand. Code, sec. 8604; Jenkins v. DeWar, 112 Tenn., 684, 82 S. W., 470; Annotation, 44 A. L. R., 397; Todd v. Third Nat. Bank, 172 Tenn., 586, 113 S. W. (2d), 740. Therefore, the $2,000 note, dated December 1, 1926, payable on demand, became barred by the six year Statute of Limitations December 2, 1932, in the absence of a new promise removing the bar.

The point of appellants' insistence is that the evidence failed to establish such a promise.

There might have been a question whether the pleadings made any issue as to a new promise, since neither the bill nor any amendment thereto alleged such a promise (Jenkins v. DeWar, supra); but the parties treated complainant's joinder of issue upon the appellants' plea of the statute as making this issue, and the cause was tried below upon this theory. So this theory can not be departed from here, and we are precluded from considering whether

the pleadings properly presented this issue. 4 C. J. S., Appeal and Error sec. 241, pp. 465, 473-478; Board of Financial Control v. Union Property Co., 21 Tenn. App., 634, 644, 114 S. W. (2d), 61, 62; Allen v. Cherokee Motor Coach Co., Inc., 20 Tenn. App., 446, 450, 100 S. W. (2d), 240, 241; Nolen v. Family Loan Co., 19 Tenn. App., 108, 113, 83 S. W. (2d), 559.

In order to remove the bar of the statute of limitations there must be either an express promise to pay, or an acknowledgment of the debt, accompanied by an expression of willingness to pay it. Warren v. Cleveland, 111 Tenn., 174, 76 S. W., 910, 102 Am. St. Rep., 749; Alexander v. Muse, 112 Tenn., 233, 79 S. W., 117; Thomas v. Hollis, 8 Tenn. App., 57, 61.

The only testimony on the question of whether there was a new promise to pay the $2,000 note is that of Snodgrass, the cashier of the bank. He testified that at various times after December 1932, and before Quarles' death both Quarles and Hunter discussed with him their indebtedness to the bank, acknowledged it and kept the interest paid up. On cross-examination he testified:

"Q. When did either of them tell you after December 1932 that they would pay this particular $2,000 indebtedness, as you say it is? A. I stated and I still state that at various times we discussed it; I can't give you the exact date or any particular time.

"Q. I am not asking you—I am asking you this, Mr. Snodgrass, after December 1, 1932, did either Mr. Quarles or Mr. Hunter tell you specifically that they would pay this particular $2,000 note? A. Yes, sir, I stated they did."

We concur in the Chancellor's finding that Quarles made a new promise, which removed the bar of this note.

(4) As stated, Mrs. Cantrell was a niece of Quarles' wife. When she was two years of age she was taken into the home of Mr. and Mrs. Quarles and reared, supported and treated by them as their own child. When she married she was still living in their home, and her husband came there to live with her. They continued to live in the Quarles home after the death of Mrs. Quarles in 1923, until the death of Mr. Quarles in 1934. There they reared two daughters to the ages of fifteen and sixteen. They, their children, and Mr. and Mrs. Quarles lived together in the same household as one family. Mr. Quarles furnished the house, paid the light and water bills and supplied most of the food for all of them. No charge was made by him to the Cantrells for these things.

When he became feeble in the latter years of his life, they waited on him, did his washing, and nursed him. They were exceedingly kind to him.

But they neither alleged nor proved that they had any contract express or implied with him to pay them for their services

to him. Since they were living with him in his home in a family relationship, the law presumes that no charge was to be made for their services, but that such services were performed gratuitously and from motives of kindness and the family relationship. Without alleging or proving a contract for pay for their services, they were not entitled to recover therefor, and the learned Chancellor rightly denied their claim. Key v. Harris, 116 Tenn., 161, 171, 92 S. W., 235, 8 Ann. Cas., 200, and cases there cited; 71 C. J., 56-58.

It results that all of the assignments of error are overruled, the Chancellor's decree is affirmed, and the cause is remanded to the Chancery Court for further proceedings not inconsistent with this opinion. Appellants and the surety on their appeal bond will pay the costs of this appeal. The costs below remain as adjudged by the Chancellor.

Faw, P. J., and Crownover, J., concur.